IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| MICHAEL THOMAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 3:16-cv-95-WKW |
| ) | [WO] |
| KYLER WILLIAMS, ) | |
| ) | |
| Defendant. ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

### I. INTRODUCTION

Plaintiff Michael Thomas is an inmate of the Alabama Department of Corrections. He filed this action under 42 U.S.C. § 1983, alleging Defendant Lee County Deputy Sheriff Kyler[1] Williams violated Plaintiff's constitutional rights when he arrested Plaintiff on September 4, 2015. Plaintiff seeks compensatory and punitive damages, and he demands a jury trial. Doc. 1 at 1 & 4.

Defendant filed an answer, special report, supplemental special report, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 14, 16 & 17. Upon receipt of Defendant's reports, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Plaintiff that "at some time in the future the court may treat the defendant's reports and the plaintiff's

---

[1] Thomas originally spelled Williams's first name as "Kyler." Doc. 1 at 1. In later filings, the parties sometimes used the name "Kyle." Docs. 14, 24 & 25. For purposes of this recommendation, the court uses the spelling in the complaint. Thomas originally named the Lee County Sheriff's Department as a defendant, but the court dismissed this party. Doc. 9.

response as a dispositive motion and response." Doc. 18. Plaintiff responded to Defendant's reports and materials. Doc. 24.

The court now will treat Defendant's reports as a motion for summary judgment. Upon consideration of the motion, the response, and the evidentiary materials filed in support and in opposition to the motion, the court concludes the motion for summary judgment is due to be granted.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

Defendant has met his evidentiary burden and demonstrated the absence of any

genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish with appropriate evidence beyond the pleadings that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that court considers facts pled in a plaintiff's sworn complaint when considering opposition to summary judgment). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). But a "mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute]

3

for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage [because 'c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'") (citation omitted). "'Inferences based upon speculation are not reasonable,' and may not defeat a motion for summary judgment. Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Solliday v. F. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (quoting *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986), and citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact). Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. Here, Plaintiff fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on his claims against Defendant.

*See Matsushita*, 475 U.S. at 587.

### III. DISCUSSION

A.  **Absolute Immunity**

Plaintiff sues Defendant in his official and individual capacities. Doc. 1 at 1. It is well established that Alabama sheriffs and their deputies are state officials and are absolutely immune from official capacity suits under the Eleventh Amendment. *Melton v. Abston*, 841 F.3d 1207, 1234 (11th Cir. 2016). State officials may not be sued in their official capacities for money damages unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (noting that Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, the court concludes that Defendant is a state actor entitled to sovereign immunity under the Eleventh Amendment for Plaintiff's claims seeking monetary damages from him in his official capacity. The claim for money damages brought against Defendant in his official capacity is therefore due to be dismissed.

B.  **Qualified Immunity**

Defendant argues that he is entitled to qualified immunity on the claims against him in his individual capacity. Doc. 14 at 10. Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their

conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendant was acting within the course and scope of his discretionary authority when the incidents complained of occurred. Plaintiff must, therefore, allege facts that when read in a light most favorable to him show that Defendant is not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided," (2) "a broader, clearly established principle that should control the

novel facts of the situation," or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling case law is drawn from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). Courts must avoid defining "clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015)). "The Court of Appeals for the Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. If the plaintiff cannot establish both elements to satisfy his burden, the defendant is entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42).

    1.    ***Summary of Material Facts***

For purposes of considering Defendant's motion for summary judgment, the court views the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R.

Civ. P. 56.

On September 4, 2015 at around 11:00 p.m., Plaintiff was driving along Highway 51. Doc. 1. Defendant, who was in training to be a Deputy Sheriff for Lee County, Alabama, was traveling southbound on Lee County Road 51. Doc. 14-1 ¶ 3. Defendant avers he was traveling with his supervising officer, Deputy Sheriff Jarrod Foley.[2] Doc. 14-1 ¶ 3. Plaintiff disputes that Defendant and Foley were traveling together, claiming that Defendant was traveling alone. Doc. 24 at 2. Plaintiff points out that Defendant's incident report does not mention that he had a partner in the car when he was patrolling, which Plaintiff identifies as a contradiction to Foley's report, which indicates that he and Defendant were together. Doc. 14-1 ¶ 3; Doc. 14-3 at 4–5; Doc. 14-4 at 2–3.

As Defendant approached the intersection of Lee County Road 51 and Lee County Road 37, he saw that Plaintiff's vehicle was stopped in the middle of the northbound lane facing perpendicular to Lee County Road 51. Defendant watched Plaintiff's vehicle reverse into the center of Lee County Road 51, turn left, and drive onto Lee County Road 37. Doc. 14-1 ¶ 4; Docs. 14-3 & 14-4. Defendant noted that Plaintiff's vehicle traveled over the centerline and over the lane marker. Docs. 14-1 ¶ 5 & 14-3. According to Plaintiff, Defendant followed Plaintiff for approximately three miles, then Plaintiff made a left turn on Wautalu Road, where Plaintiff lived, and Plaintiff traveled another three hundred yards

---

[2] Plaintiff notes that the summary judgment record does not include an affidavit from Foley or an incident report regarding the use of a taser. Doc. 24 at 4. The record does include a "Special Report" Foley submitted to Captain Wallace, and Plaintiff provides no evidence suggesting a different incident report was required by the Lee County Sheriff's Office. Doc. 14-4. The absence of an affidavit from Foley or another report are not facts material to summary judgment. Rule 56 does not require an affidavit from each witness to an event.

8

before noticing the flashing blue lights behind him. Doc. 1 at 6. Plaintiff states that he was certain he had not committed any traffic violations so he kept driving another one hundred yards. Doc. 1 at 6. He then pulled over on the left side of the road directly in front of his relative's clubhouse. Doc. 1 at 6. Plaintiff states this occurred in an isolated area, and he "knew he were about to become another victim to abuse and was about to urinate on himself." Doc. 1 at 6.

Defendant approached the driver's side of the vehicle and asked Plaintiff for his driver's license. Defendant saw open beer cans inside the car and could smell alcohol. Docs. 14-1 ¶ 6 & 14-3. Plaintiff claims that he was not drinking and that Defendant took an empty beer can from a nearby garbage can "and used it to secure a DUI offense" against him. Doc. 1 at 7. Plaintiff states he told Defendant he had not been drinking. Doc. 1 at 7.

Plaintiff asked Defendant, "What did I do wrong officer?" He then gave his driver's license to Defendant. Doc. 1 at 6. Defendant noticed that Plaintiff was having difficulty retrieving his license from his wallet and answering Defendant's questions. Docs. 14-1 ¶ 6 & 14-3.

Defendant then began to walk back to his patrol car. According to Plaintiff, he opened up his car door and asked Defendant if he could urinate. Defendant said no, and Plaintiff closed his car door. Doc. 1 at 6. According to Defendant, however, Plaintiff made several attempts to exit his vehicle despite Defendant's verbal commands not to do so. Doc. 14-1 ¶ 6. Plaintiff maintains that Defendant ordered him out of the car, and he again asked if he could urinate, but Defendant refused. Doc. 1 at 6. According to Defendant, Plaintiff refused repeated commands not to urinate. Docs. 14-1 ¶ 7 & 14-3. Foley's report indicates

9

that Defendant was sitting in the car attempting to run Plaintiff's license when Plaintiff exited his car and began urinating in the front yard of the house nearby. Doc. 14-4. Plaintiff states Defendant asked Plaintiff to take a breath test, and Plaintiff refused. Doc. 1 at 6. Plaintiff maintains that Defendant did not administer any field sobriety tests. Doc. 1 at 7. Defendant then told Plaintiff he was under arrest. Doc. 1 at 7.

Plaintiff states that he "kept trying to explain himself . . . that he had not been drinking." Doc. 1 at 7. Defendant then told Plaintiff to turn around and hold his hands behind his back. Doc. 1 at 7. Plaintiff states that he complied, and he said he was on parole and did not do anything wrong. Doc. 1 at 7; Doc. 14-1 ¶ 8; Doc. 14-3. Plaintiff then asked Defendant why he was being arrested, but Defendant did not answer. Plaintiff admits that he told Defendant that he was "not going to let defendant put hand-cuffs on him because [I] did not do anything wrong to go to jail for." Doc. 1 at 7. Plaintiff states Defendant was alone at that point and did not call for backup. Doc. 1 at 7.

The parties dispute whether Defendant, alone, arrested Plaintiff or whether Foley assisted Defendant. Plaintiff asserts he and Defendant were alone when Plaintiff was arrested, and Foley arrived after Plaintiff was already on the ground. Doc. 1 at 7. In contrast, Defendant asserts Foley assisted in arresting Plaintiff. Doc. 14-1 ¶ 8. The reports Defendant and Foley prepared shortly after the incident also indicate Foley assisted Defendant in arresting Plaintiff. Docs. 14-2, 14-3 & 14-4.

According to Plaintiff, while his back was turned to Defendant, Defendant deployed his stun gun on Plaintiff. Doc. 1 at 7. He claims that "it was vivid that Defendant Williams was the person that tasered him while his back was to him with his hands up coupled with

10

the factor that Defendant Williams was alone before another deputy joined him later." Doc. 24 at 2–3. Plaintiff states the stun gun knocked him to the ground face down. Doc. 1 at 7. While he was on his stomach, he was paralyzed and could not talk. Doc. 1 at 7. Plaintiff states that in no way did he "ever resist. Each time Plaintiff raised his hand as he surrend[ered], defendant Williams turned the static electricity up higher and higher approximately four times and started laughing out loud, Plaintiff could hear." Doc. 1 at 7. Plaintiff claims that a second man then appeared on scene to assist Defendant. Doc. 1 at 7. According Plaintiff's later statement, however, the deputies began to laugh together when the second deputy arrived. Doc. 24 at 3. They put handcuffs on Plaintiff, picked him up off the ground, and put him in the back seat of the patrol car. Doc. 1 at 7. Defendant then obtained the beer can from the garbage cans to support the subsequent DUI charge and parole violation. Doc. 1 at 7–8. Plaintiff maintains that he suffered injuries such as hearing loss and some vision loss as the result of a stroke induced by the tasing. Doc. 1 at 8; Doc. 24 at 3 & 7–8.

In contrast, Defendant claims that after Plaintiff urinated on the yard "efforts were made to place [Plaintiff] into custody." Docs. 14-1 ¶ 8, 14-3 & 14-4. According to Defendant's affidavit and reports, he and Foley approached Plaintiff, asked him to face the car, and to put his hands behind his back. Once Plaintiff placed his left hand behind his back, he began resisting arrest, stating that he was on parole and had done nothing wrong. Docs. 14-1 ¶ 8 & 14-3. Foley then grabbed Plaintiff's right arm and Defendant grabbed Plaintiff's left arm. Docs. 14-1 ¶ 8 & 14-3. The deputies struggled to secure Plaintiff's hands, but Defendant could secure only Plaintiff's left hand in a handcuff, and Plaintiff

11

was positioned in such a way as to free his left arm, which was still in handcuffs, and Plaintiff began swinging his left arm at the deputies. Docs. 14-1 ¶ 8 & 14-3. According to Defendant, Foley informed Plaintiff he would be tased if he did not put his hands behind his back, but Plaintiff continued to refuse to comply. Docs. 14-1 ¶ 9 & 14-3. According to Defendant, Foley then fired his taser and hit Plaintiff near the center of his chest and lower torso, but the prongs did not make good contact, and Plaintiff continued to resist. Doc. 14-1 ¶ 10; Doc. 14-3; Doc. 14-4. Foley fired his taser a second time, and the prongs made contact with the center and lower part of Plaintiff's back, causing Plaintiff to lay down on the ground. Doc. 14-1 ¶ 10; Doc. 14-3; Doc. 14-4. Plaintiff continued to refuse to place his hands behind his back, and he had to be tased a third time. Docs. 14-1 ¶ 10 & 14-3. Foley reported he "had to use the tazer's arc function twice to secure the open handcuff and place it on [Plaintiff's] other wrist." Doc. 14-4 at 2.

According to Defendant, Plaintiff refused to participate in field sobriety tests. Doc. 14-1 ¶ 11; Doc. 14-3; Doc. 14-4. Defendant asserts that Plaintiff refused the testing despite warnings that his refusal would result in the suspension of his driving privileges. Docs. 14-1 ¶ 11 & 14-3. Defendant states that after Plaintiff was placed in the patrol car his car was inventoried and "a cold, open and half-empty sixteen (16) ounce" beer was found on the front passenger seat. Docs. 14-1 ¶ 12 & 14-3.

Defendant disputes that Plaintiff was not told the reason for his arrest. Doc. 14-1 ¶ 13. Defendant denies that he turned the static electricity higher on four occasions and laughed at Plaintiff. Doc. 14-1 ¶ 14. He maintains that he never discharged his taser on Plaintiff and that only Foley used a taser. Doc. 14-1 ¶¶ 14–15.

12

The Volunteer Fire Department was called to the scene and a member of the department removed the taser probes from Plaintiff's body. Doc. 14-4. Plaintiff was transported to a detention facility. During the trip, Plaintiff said he wanted to make a deal in which he would give them the names of drug dealers if the deputies "could give him a break." Doc. 14-1 ¶ 18. Plaintiff also said he had seen the deputies before through a scope on his gun while he was sitting in a deer stand. Doc. 14-1 ¶ 18. When they arrived at the facility, Plaintiff said he could not get out of the car because he could not move his extremities. Doc. 14-1 ¶ 18; Doc. 14-3; Doc. 14-4. Paramedics were called. After they determined that Plaintiff's blood pressure was normal, he became noncompliant and refused treatment. Doc. 14-1 ¶ 19; Doc. 14-3; Doc. 14-4. Plaintiff was then booked into the facility without further incident. Doc. 14-4.

A video of the arrest is in the record. Doc. 17. The recording is of exceedingly poor quality, but it does depict a uniformed deputy approaching the driver's side of Plaintiff's car, then another uniformed deputy walking into view. The two deputies move toward Plaintiff, who is standing next to his car. The officers and Plaintiff then struggle while standing near the driver's side of Plaintiff's car. Eventually, the people depicted in the video are no longer visible. Plaintiff challenges the authenticity of the video, asserting that frames were removed, that it does not depict the time when the deputy was following Plaintiff, and that "the video time was reduced and it has no audio, which indicates it was doctored." Doc. 24 at 5–6. Even assuming the video was altered as Plaintiff describes, Plaintiff does not challenge the authenticity of what the video depicts—Plaintiff standing near his car while struggling with two deputies.

###   2.   *Applicable Law*

The Fourth Amendment's freedom from unreasonable seizures encompasses the right to be free from excessive force during the course of criminal apprehension. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). Excessive force is measured by an objective reasonableness standard which balances the nature and quality of the intrusion on Fourth Amendment interests against the government interest at stake. *Oliver*, 586 F.2d at 905. Courts consider the *Graham* factors, which take into account the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect actively resists arrest or attempts to evade arrest by flight. *Id*. Other factors to consider may include the need for application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted. *Lee*, 284 F.3d at 1198 n.7.

Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and therefore police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela*, 138 S. Ct. at 1153. The Eleventh Circuit recently denied qualified immunity to an officer effecting an arrest for reckless driving, eluding an officer, and resisting arrest where the plaintiff alleged repeated, unnecessary taser shocks. *Glasscox v. Argo*, 903 F.3d 1207, 1214 (11th Cir. 2018). When considering whether use of a taser amounts to excessive force, the critical timeframe for analysis begins "just before activation" and runs until the last deployment of the taser. *Id.*

*3.     Discussion*

According to Plaintiff's verified complaint, Defendant tased him multiple times while he was on the ground, not resisting, and each time he raised his hand in surrender Defendant "turned the static electricity up higher and higher approximately four times."[3] Doc. 1 at 7. The video in evidence is of poor quality such that the court cannot rely on it to corroborate or contradict Plaintiff's statement regarding the number of times he was tased or the taser settings. Foley's report indicates that he "use[d] the tazer's arc function twice to secure the open handcuff and place it on Thomas's other wrist." Doc. 14-1 at 2. Taking Plaintiff's narrow version of the events as true, a jury could find that repeated, progressively stronger tasings of Plaintiff during a period when he was not resisting arrest amounts to excessive force. *Manners v. Cannella*, 891 F.3d 959, 974 (11th Cir. 2018) ("The use of a taser "beyond [the arrestee's] complete physical capitulation" repeatedly in a short period where an arrestee was mostly cooperative and made no attempt to flee would be excessive."). The problem for Plaintiff, however, is that he does not create a genuine dispute of fact that it was Defendant who deployed the taser on Plaintiff, not Foley. Further, Plaintiff does not create a genuine dispute whether Defendant violated his Fourth Amendment rights.

Plaintiff insists it was Defendant, alone, who deployed the taser on Plaintiff. Plaintiff's statement is contradicted by the deputies' contemporaneously created reports, the video, and Plaintiff's own statement. The video quality is sufficient to contradict

---

[3] Plaintiff maintains that the deputies began laughing after Foley arrived. Doc. 24 at 3. But an officer's subjective motivation has no place in the reasonableness inquiry, which considers whether the act was objectively unreasonable under the circumstances. *Graham*, 490 U.S. at 397–98.

Plaintiff's claim that he was alone with Defendant when the taser was deployed. First, contrary to Plaintiff's statement that Foley arrived later and therefore could not have been the one to administer the taser, Foley's report indicates he and Defendant were traveling together and therefore arrived at the same time. Doc. 14-4 at 2. Plaintiff asserts that Defendant's failure to state in his own report that Foley was riding in the car with Defendant means Foley was not riding with Defendant. Doc. 24 at 2–5. But the absence of a fact in a report does not mean Plaintiff can replace it with one of his own choosing. It is undisputed Defendant was still undergoing training and Foley was Defendant's supervisor, further supporting the report that Foley and Defendant rode together and that Foley assisted in the arrest. Doc. 14-1; Doc. 14-2 at 2; Doc. 14-3; Doc. 14-4 at 4–5. Furthermore, contrary to Plaintiff's statement that he was on the ground when Foley arrived, the video shows two deputies standing next to Plaintiff, who is standing next to the car. The video also verifies the deputies' statements that both of them were involved in placing handcuffs on Plaintiff in as much as it depicts, in sequence, the two deputies standing next to Plaintiff, a scuffle between the deputies and Plaintiff, and then the individuals no longer standing. The video evidence thus directly contradicts Plaintiff's assertion that he was alone with Defendant. Finally, Plaintiff claims that he was tased in the back while his arms were up and he was facing the car. Doc. 24 at 2. This admission that he was facing away from whomever used the taser undermines his statement that he saw who deployed the taser on him. Ultimately, Plaintiff's self-serving statement does not create a question of fact in the face of the contradictory, contemporaneously created police reports and video. *Cf. Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) ("Self-serving statements by a plaintiff

16

do not create a question of fact in the face of contradictory, contemporaneously created medical records."); *see also Scott,* 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). There is no genuine dispute as to who administered the taser on Plaintiff. Here "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [therefore] there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587.

Moreover, viewing the evidence in the light most favorable to Plaintiff, the court determines that a reasonable officer in Defendant's position would not have understood that the force used to arrest Plaintiff was a violation of his Fourth Amendment rights. Plaintiff had been observed violating traffic rules, and the deputy smelled alcohol on him and suspected he was driving under the influence. Plaintiff repeatedly refused to comply with Defendant's demands not to walk toward the patrol car. He urinated on the ground. He specifically told the officers he would not allow them to put handcuffs on him. He resisted being handcuffed and scuffled with two deputies as they began to apply force to secure handcuffs on him. Plaintiff does not claim Defendant used excessive force when applying handcuffs to him after he resisted being handcuffed. *Cf. Manners*, 891 F.3d at 974 (holding videotape established plaintiff resisted arrest and that the force needed to handcuff plaintiff "was not excessive under any clearly established precedent"). At the time Plaintiff was resisting arrest, just before the activation of the taser, the use of a taser on him was not an objectively unreasonable response to his efforts to resist arrest. Following Foley's initial

17

deployment of the taser, Plaintiff asserts the current was increased, but he does not indicate how Defendant, the assisting officer, would have realized the current was increased.

In addition, Plaintiff makes no claim that either deputy failed to intervene while he was subjected to excessive force. *Cf. Callwood v. Jones*, 727 F. App'x 552, 560 (11th Cir. 2018) ("Because the law does not clearly establish that [the deputy] used excessive force, the other officers had no duty to intervene."). There also is no dispute that Plaintiff received only brief medical treatment after the taser probes were removed. He initially refused to get out of the car at the jail, but after the paramedics responded he refused treatment, and he was booked into the jail without incident, suggesting that he did not suffer serious harm.[4] Based on the totality of the circumstances, it is not "beyond debate" that Defendant used excessive force in arresting Plaintiff in violation of his Fourth Amendment rights. *Kisela*, 138 S. Ct. at 1152. Defendant is therefore entitled to qualified immunity, and summary judgment is due to be granted in his favor.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The Defendant's motion for summary judgment be GRANTED.

2. Judgment be GRANTED in favor of Defendant.

3. This case be DISMISSED with prejudice.

4. The costs of this proceeding be taxed against Plaintiff.

---

[4] Plaintiff's assertions that he suffered a stroke from excessive tasing, causing damage to his eyes and hearing loss, are conclusory and lacking in evidentiary support. Doc. 24 at 3 & 7–8. He asks for an opportunity "to allow the medical evidence to be reviewed," Doc. 24 at 8, but he submits no medical evidence that could generate a genuine dispute of fact regarding his injuries.

It is further ORDERED that on or before **December 28, 2018,** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a de novo determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 13th day of December, 2018.

/s/ Gray M. Borden
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE